# UNITED STATES COURT OF APPEALS

## FOR THE FIFTH CIRCUIT

_____

### 24-30229

_____

## UNITED STATES OF AMERICA,

Plaintiff-Appellee

**v.**

## SARAH ELAINE FOGLE; JEREMIAH MICAH DEARE,

Defendants-Appellants

Appeal from the United States District Court for the
Western District of Louisiana
CRIMINAL NUMBERS 6:21-CR-212-2 and 6:21-CR-212-1

_____

## BRIEF ON BEHALF OF APPELLEE,
## THE UNITED STATES OF AMERICA

_____

BRANDON B. BROWN
United States Attorney
Western District of Louisiana

T. FORREST PHILLIPS
AL Bar # 3736E29R
Assistant United States Attorney
800 Lafayette Street, Suite 2200
Lafayette, LA 70501
(337) 262-6618
Attorneys for Plaintiff-Appellee

# STATEMENT REGARDING ORAL ARGUMENT

This appeal presents four total issues, with the defendants making arguments regarding (1) the district court's ruling on pre-trial motions to dismiss; (2) the sufficiency of the evidence supporting Fogle's conviction; (3) an unpreserved claim contesting the appropriateness of remarks made during the prosecutor's closing argument; and (4) the substantive reasonableness of Deare's sentence. The parties' arguments regarding these issues are adequately set forth in their briefs and can be decided by controlling law. Accordingly, the United States respectfully submits that oral argument would not assist the Court.

# TABLE OF CONTENTS

**PAGES**

STATEMENT REGARDING ORAL ARGUMENT ...................................i

TABLE OF AUTHORITIES....................................................................v

STATEMENT OF JURISDICTION.......................................................1

ISSUES ON APPEAL ...........................................................................2

STATEMENT OF THE CASE ...............................................................3

    *Relevant Background* ........................................................... 4

    *Offense Conduct* ................................................................. 7

    *Pretrial Proceedings* ........................................................ 13

    *Trial and Sentencing*........................................................ 14

SUMMARY OF THE ARGUMENT ...................................................22

ARGUMENT .......................................................................................25

I.    The district court did not err in denying Deare's
motions to dismiss under the Second Amendment and
the constitutional "vagueness" doctrine .............................. 25

    A.    Standard of Review..................................................... 25

    B.    Applicable Substantive Law ....................................... 26

**TABLE OF CONTENTS** *(continued)*

**PAGES**

      *1.*    *18 U.S.C. § 922(a)(1)* ...........................................26

      *2.*    *The Second Amendment and Commercial Firearms Sales* ...................................................27

      *3.*    *Constitutional Vagueness Doctrine* .....................28

   C.    Application of the Law to the Record .........................29

      *1.*    *The district court did not err in denying Deare's* Bruen*-based motion to dismiss* .............30

      *2.*    *The district court also did not err in rejecting Deare's vagueness challenge* ................35

II.   Sufficient evidence supported the jury's conclusion that Fogle acted "willfully," including evidence that Fogle lied about the true nature of her firearm "personal collection" and evidence showing she had a comprehensive knowledge of FFL laws ...............................38

   A.    Standard of Review ......................................................38

   B.    Applicable Substantive Law ........................................39

   C.    Application of the Law to the Record .........................40

III.  The prosecutor's closing argument remarks about ATF Agent Hurstell's testimony were not "clearly or obviously" a reference to facts not in evidence. Regardless, given the other unchallenged evidence of "willfulness," Fogle cannot show an effect on her substantial rights .................................................................47

# TABLE OF CONTENTS *(continued)*

**PAGES**

A.    Standard of Review .......................................................47

B.    Applicable Substantive Law ........................................47

C.    Application of the Law to the Record ..........................48

IV.    Deare's low-end guideline sentence was not substantively unreasonable ..................................................53

A.    Standard of Review .......................................................53

B.    Applicable Substantive Law ........................................53

C.    Application of the Law to the Record ..........................54

CONCLUSION ........................................................................56

CERTIFICATE OF SERVICE and
    COMPLIANCE WITH ECF FILING STANDARDS .....................57

CERTIFICATE OF COMPLIANCE.........................................58

# TABLE OF AUTHORITIES

**PAGES**

## U. S. CONSTITUTION

U.S. Const. amend. II ............................................................. 27

## FEDERAL CASES

*Broadrick v. Oklahoma,*
      413 U.S. 601 (1973) ....................................................... 28

*Cheek v. United States,*
      498 U.S. 192 (1991) ....................................................... 42

*Dist. of Columbia v. Heller,*
      554 U.S. 570 (2008) .................................................... 27-28

*Holder v. Humanitarian Law Project,*
      561 U.S. 1 (2010) .......................................................... 29

*Jackson v. Virginia,*
      443 U.S. 307 (1979) ....................................................... 38

*Loper Bright Enters. v. Raimondo,*
      603 U.S. 369 (2024) .................................................... 37-38

*McRorey v. Garland,*
      99 F.4th 831 (5th Cir. 2024) ......................................... 32

*N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen,*
      597 U.S. 1 (2022) ................................................... *passim*

*Teixeira v. County of Alameda,*
      873 F.3d 670 (9th Cir. 2017) (en banc) ........................... 27, 30, 33

# TABLE OF AUTHORITIES *(continued)*

**PAGES**

*United States v. Alaniz,*
    726 F.3d 586 (5th Cir. 2013) ....................................................... 39

*United States v. Alvarado,*
    691 F.3d 592 (5th Cir. 2012) ............................................. 53-54, 56

*United States v. Bennett,*
    874 F.3d 236 (5th Cir. 2017) ....................................................... 50

*United States v. Blount,*
    906 F.3d 381 (5th Cir. 2018) ................................................. 37, 55

*United States v. Boyd,*
    773 F.3d 637 (5th Cir. 2014) ....................................................... 48

*United States v. Brannan,*
    98 F.4th 636 (5th Cir. 2024) ....................................................... 46

*United States v. Calles*,
    482 F.2d 1155 (5th Cir. 1973) ..................................................... 42

*United States v. Daniels*,
    252 F.3d 411 (5th Cir. 2001) ....................................................... 30

*United States v. Diehl*,
    775 F.3d 714 (5th Cir. 2015) ....................................................... 53

*United States v. French*,
    121 F.4th 538 (5th Cir. 2024) ..................................................... 31

*United States v. Gonzalez-Rodriguez*,
    621 F.3d 354 (5th Cir. 2010) ................................................. 51-52

vi

# TABLE OF AUTHORITIES *(continued)*

**PAGES**

*United States v. Howard,*
766 F.3d 414 (5th Cir. 2014) ....................................................... 25

*United States v. Iredia,*
866 F.2d 114 (5th Cir. 1989) ....................................................... 48

*United States v. Lara,*
23 F.4th 459 (5th Cir. 2022) ....................................................... 47

*United States v. Lindell,*
881 F.2d 1313 (5th Cir. 1989) ..................................................... 30

*United States v. Lozano,*
791 F.3d 535 (5th Cir. 2015) ....................................................... 25

*United States v. Marchetti,*
96 F.4th 818 (5th Cir. 2024) .................................................. 43, 47

*United States v. McElwee,*
646 F.3d 328 (5th Cir. 2011) ....................................................... 54

*United States v. Meza,*
701 F.3d 411 (5th Cir. 2012) ....................................................... 44

*United States v. Nora,*
988 F.3d 823 (5th Cir. 2021) ............................................. 39-40, 46

*United States v. Olano,*
507 U.S. 725 (1993) ..................................................................... 25

*United States v. Patino-Prado,*
533 F.3d 304 (5th Cir. 2008) ....................................................... 52

# TABLE OF AUTHORITIES *(continued)*

**PAGES**

*United States v. Rahimi,*
  602 U.S. 680 (2024) ................................................................ 34-35

*United States v. Rhine,*
  637 F.3d 525 (5th Cir. 2011) ...................................................... 53

*United States v. Shipley,*
  546 F. App'x 450 (5th Cir. 2013) .............................................. 36-37

*United States v. Smith,*
  440 F.3d 704 (5th Cir. 2006) ...................................................... 54

*United States v. Stevenson,*
  126 F.3d 662 (5th Cir. 1997) .................................................... 38-39

*United States v. Strunk,*
  551 F. App'x 245 (5th Cir. 2014) .............................................. 36, 39

*United States v. Tuma,*
  738 F.3d 681 (5th Cir. 2013) ...................................................... 54

*United States v. Vargas,*
  580 F.3d 274 (5th Cir. 2009) ...................................................... 48

*United States v. Williams,*
  553 U.S. 285 (2008) .................................................................. 28

*United States v. Wise,*
  221 F.3d 140 (5th Cir. 2000) ...................................................... 46

*United States v. Zhen Shou Wu,*
  711 F.3d 1 (1st Cir. 2013) .......................................................... 37

# TABLE OF AUTHORITIES *(continued)*

**PAGES**

## FEDERAL STATUTES

18 U.S.C. § 371 ...................................................................... 13, 39

18 U.S.C. § 921(a)(21) ................................................... 22, 26, 35, 46-47

18 U.S.C. § 921(a)(23) ....................................................... 26-27

18 U.S.C. § 922(a)(1) ................................................... 13, 26, 37

18 U.S.C. § 922(a)(1)(A) ............................................ 14, 26, 36-37, 39

18 U.S.C. § 922(g) ................................................................ 32

18 U.S.C. § 922(g)(8) ........................................................... 35

18 U.S.C. § 3231 ................................................................... 1

18 U.S.C. § 3553(a) .......................................................... 53-54

18 U.S.C. § 3742 ................................................................... 1

28 U.S.C. § 1291 ................................................................... 1

28 U.S.C. § 5845(f) ............................................................... 46

## CODE OF FEDERAL REGULATIONS

27 C.F.R. § 478 ................................................................... 50

# TABLE OF AUTHORITIES *(continued)*

**PAGES**

## HISTORICAL LAWS

The Charter and Ordinances of the City of Providence,
Together with the Acts of the General Assembly
Relating to the City 89 ............................................................ 33-34

William Henry Whitmore,
The Colonial Laws of Massachusetts (1890) ................................ 33

## FEDERAL RULES OF CRIMINAL PROCEDURE

Fed. R. Crim. P. 29 ........................................................ 38, 44

## FIFTH CIRCUIT PATTERN JURY INSTRUCTIONS

Fifth Cir. Pattern Jury Instr. (Criminal) § 2.15A (2019) ...................... 39

## OTHER AUTHORITIES

ATF Fact Sheet, "FFL Compliance Inspections" (Feb. 2013),
https://www.atf.gov/resource-center/docs/factsheet-ffl-complaincepdf-0/download (last visited January 5, 2025) ................................. 5

Kevin Sweeney, *An Eighteenth-Century Gun Culture Shaped by
Constraints*, Duke Center for Firearms Laws (September 6, 2023),
*available at* https://firearmslaw.duke.edu/2023/09/an-eighteenth-century-gun-culture-shaped-by-constraints (last visited January 5,
2025) .................................................................... 34

## STATEMENT OF JURISDICTION

This is an appeal from a final judgment in a criminal case. The district court had subject matter jurisdiction under 18 U.S.C. § 3231. The district court entered the judgment of conviction for both defendants on April 4, 2024. ROA.3977, ROA.4984. Fogle filed a notice of appeal on April 8th, while Deare filed his on April 10th, thus making both notices timely. ROA.663, ROA.5086. This Court has appellate jurisdiction under 28 U.S.C. § 1291 and 18 U.S.C. § 3742.

# ISSUES ON APPEAL

I.   Did the district court err in denying Deare's motions to dismiss, which alleged a Second Amendment violation and a constitutional "vagueness" challenge, respectively?

II.  Did sufficient evidence support the jury's verdict against Fogle for conspiring to deal firearms without an FFL license, specifically its finding that Fogle acted "willfully"?

III. Did the prosecutor "clearly or obviously" err when describing the content of an ATF agent's testimony about what laws were discussed at an ATF inspection meeting for which Fogle was present? Alternatively, assuming clear or obvious error, can Fogle show an effect on her substantial rights?

IV.  Was Deare's sentence substantively unreasonable?

## STATEMENT OF THE CASE

This appeal follows the conviction at trial of the defendants, Jeremiah Deare and Sarah Fogle (a married couple) for conspiring to engage in the business of dealing firearms without a federal firearms license (FFL), with Deare also being convicted of multiple crimes based on false records produced as part of this scheme. ROA.3666–70. ROA.5161–65.

On appeal, Deare and Fogle bring a host of arguments, with no shared issues between their separate briefs. Deare focuses on pre-trial rulings, arguing mainly that the district court erred in denying his two motions to dismiss (these motions raised a *Bruen*-based Second Amendment claim and a constitutional vagueness challenge, respectively). Deare also challenges the substantive reasonableness of his within-guideline sentence.

Fogle, meanwhile, focuses on alleged trial errors, with her main argument being that the government did not offer sufficient evidence to establish she acted "willfully" when conspiring to deal firearms without an FFL. Fogle also argues, for the first time on appeal, that the government made improper remarks during closing argument,

referencing facts outside the record when describing some of the evidence going towards Fogle's "willfulness."

### Relevant Background

In July 2015, Deare bought "Dave's Gun Shop," an FFL-backed firearms store in Lafayette, Louisiana. ROA.4025–26, ROA.4052–53. Around the same time, Deare met Fogle. ROA.4628. By December 2018, Deare and Fogle had bought a home together. ROA.4574–76. By September 2019, they were married. ROA.4574–76.

Deare and Fogle's shared livelihood depended on selling guns.[1] For a time, they did this through Dave's Gun Shop. By mid-2019, however, Dave's Gun Shop was in regulatory and financial trouble. First, ATF compliance inspectors discovered an astonishing number of FFL violations at Dave's Gun Shop. These violations included over one hundred defective "A&D" book entries (i.e., federally required firearm transfer records) and dozens of incomplete "ATF 4473" forms (i.e., customer background checks). ROA.846–54, ROA.4068–71. In short, Deare's record keeping was so deficient that ATF had no way of knowing what guns Dave's Gun Shop had sold, much less if those guns

---

[1] Fogle wrote an online blog but did not make any real money doing so. ROA.4014, ROA.4629, ROA.4542.

were sold to prohibited persons (felons, illegal immigrants, domestic abusers, etc.).

Because Dave's Gun Shop's violations were so serious, ATF required that Deare attend a "warning conference" at the agency's Baton Rouge office, at which Deare had to provide explanations for the gun shop's many violations and assurances regarding how he would prevent similar ones in the future.[2] ROA.4073. During this "warning conference," ATF inspectors explained to Deare each of Dave's Gun Shop's many FFL rule violations. ROA.4073–74, ROA.4077, ROA.855–57. Fogle attended this warning conference as well. ROA.4074–75.

Fogle was not pleased about ATF's actions against Dave's Gun Shop. In fact, just two weeks before the ATF warning conference, Fogle authored an online blog post, in which she stated that "the more [ATF] regulations that are enacted the more people will go underground with

---

[2] Before deciding to hold a "warning conference," ATF agents took the more routine step of visiting with Deare and discussing their inspection findings. ROA.4070–75. This first meeting was referred to as a "closing conference" in ATF documents and during testimony at trial, since this more routine conference is often the last step of the inspection process, with only more severe cases requiring an additional "warning conference" to resolve FFL violations. *See* ATF Fact Sheet, "FFL Compliance Inspections" (Feb. 2013) (explaining that warning conferences are required on a case-by-case basis, and are one of the tools ATF uses to "gain cooperation and compliance from FFLs" in lieu of immediately starting the FFL revocation process), *available at* https://www.atf.gov/resource-center/docs/factsheet-ffl-complaincepdf-0/download (last visited January 5, 2025).

their buying and selling, making it harder to enforce anything at all." ROA.3157. In this same online blog post, Fogle showed an impressive knowledge of the various laws commercial firearms dealers must comply with, explaining that federal law requires FFL holders to perform background checks on all customers (even at gun shows), while people making "individual sales" from their own collections are excused from this requirement via a convenient "loophole." ROA.3157.[3] Fogle reassured her blog readers that "FFL holders" do seek to comply with some laws, since failing to do so can result in an FFL holder losing its license (in Fogle's words, its "ability to operate"), thus imperiling the owners' "livelihood." ROA.3157.

ATF's increased scrutiny of Dave's Gun Shop was not the defendants' only problem. Deare's debt to the Dave's Gun Shop's previous owner also risked sinking the business. ROA.4050–51. Eventually, the previous owner, "Dave," obtained a state-court judgment against Dave's Gun Shop and Deare. This judgment required that Deare place the shop's funds in an escrow account; it also limited Deare's ability to transfer store

---

[3] Fogle even explained what the acronym "FFL" stood for ("federal firearms license"), despite later building a trial defense on the supposed ignorance of this basic licensing requirement. ROA.3157.

inventory outside of normal sales. ROA.829. Fogle was also unhappy about this litigation and its resulting strain on the couple's finances, writing in her journal that she wanted to "punch Dave in the dick." ROA.3497.

### Offense Conduct

So, with the financial and regulatory walls closing in, Deare and Fogle decided to, in the latter's phrasing, "go underground" with their firearms business. ROA.4000, ROA.4371, ROA.4374–75. Specifically, the couple started operating as unlicensed gun dealers, peddling hundreds of firearms out of their home and at gun shows, all under the pretense of merely selling off portions of Fogle's non-existent "personal collection." ROA.4182–83, ROA.4227.

Deare and Fogle acquired inventory for this unlicensed gun business in several ways. First, Deare took guns from Dave's Gun Shop, including guns that customers had merely left on consignment (meaning the gun shop did not even own them for transfer to a "personal collection"). ROA.4169, ROA.4179, ROA.4482. Deare omitted these guns from the gun shop's A&D book before moving them into the illegal business. The couple then pretended these guns were part of Fogle's

7

"personal collection," even as Deare and Fogle otherwise treated the guns just like commercial inventory. ROA.4182, ROA.4226, ROA.4235–36.

Deare and Fogle also bought guns in bulk from auction houses, estate sales, pawn shops, and liquidating collectors (i.e., people selling off a collection amassed over years or decades, not regularly selling guns for profit, restocking inventory, and selling again like the defendants were). ROA.3176, ROA.4219, ROA.4298–30, ROA.4324, ROA.4426. Fogle took the lead in some of these bulk-buy transactions. For example, in July 2020, Fogle purchased roughly 70 military rifles from an estate sale in central Louisiana. ROA.4252–55, ROA.4371. Fogle paid $20,000 in cash—money likely taken from Dave's Gun Shop's cash safe—and told the seller to put the receipt in her name. ROA.4257, ROA.3148. Four days after buying these military rifles to add to Fogle's "personal collection," Fogle and Deare were selling them at gun shows. ROA.4408–09, ROA.4477, ROA.4611.

With a physical storefront being out of the question, gun shows were the defendants' main venue for their unlicensed business. ROA.4318, ROA.4132, ROA.4227, ROA.4393–95, ROA.3647–54. Fogle often completed and signed the vendor registration forms for these gun

shows (even when she put Deare's name down as the exhibitor). ROA.3110–18, ROA.3129–34. Fogle was not a passive presence at the vendor table; she made sales and accepted payments. ROA.4224. Sometimes, Fogle even invited customers to visit her and Deare's home to look at the full scope of the defendants' gun inventory. ROA.4464. In her journal, Fogle worked out a detailed pricing scheme for ammunition to sell alongside their gun inventory, even noting that "friends," or repeat customers, should get a discount over "norms" (more casual shoppers). ROA.3507–25.

When customers questioned the lack of a background check during their gun-show purchases, Deare and Fogle maintained that they were merely making "private sales" from a personal collection, so no background check was needed. ROA.4477, ROA.4132–33. The bank statements told a different story: from August 2019 to February 2021, Deare and Fogle's unlicensed gun sales brought in roughly the same amount of money (and vastly more profit for the defendants) as the sales at the couple's admittedly "commercial" enterprise, Dave's Gun Shop. ROA.3645.

As Deare and Fogle embraced their underground gun business, Deare let Dave's Gun Shop fall by the wayside. The gun shop's sales were declining, the store's new inventory shipments were "dwindling," and Deare himself was rarely seen at the store. ROA.4168–70, ROA.4179–80, ROA.4222–24. Employees became worried, especially when they noticed that some firearms they had helped prepare for sale (like the military rifles Fogle bought at the estate sale, or a 20-gun batch of AR rifles the gun shop took in on consignment) were missing from the store's records and inventory. ROA.4169, ROA.4178–79, ROA.4190, ROA.4226, ROA.4273.

Some gun shop employees—at a loss for why Dave's Gun Shop was struggling even as Deare and Fogle were seemingly doing well with their gun show sales—took their concerns to Deare and Fogle. Both Deare and Fogle told one inquiring employee that the firearms they were selling at gun shows were from Fogle's "personal collection," even those guns that had once been Dave's Gun Shop inventory. ROA.4226–27. Deare later elaborated: he and Fogle were claiming these guns were part of Fogle's personal collection because Deare's name was attached to Dave's Gun Shop's FFL. ROA.4182–83.

Deare and Fogle's "personal collection" story nevertheless eventually unraveled. ROA.4132–33. The ensuing ATF investigation led to search warrants for both the defendants' home and Dave's Gun Shop. ROA.4352. At the couple's house, ATF agents found roughly 250 guns. Many of these firearms were arranged as if on display for sale, with the weapons found neatly arranged in closets, on counter tops, and on beds. Many bore large, homemade price tags.

 



Gov. Exhibits 205, 207, 232
ROA.3611–12, ROA.3622

Other guns were loaded onto a trailer for transport to an upcoming gun show, stored in cubby-style cabinets, or mounted on the display stands often seen at the couple's gun show tables.

 



Gov. Exhibits 221, 228, 274
ROA.3617, ROA.3619, ROA.3630

Fogle, who was home during the execution of the search warrant, agreed to speak to ATF agents. Fogle admitted that she was not a gun collector, having purchased just "a couple" firearms for herself before meeting Deare. ROA.4371. Fogle acknowledged that she had been buying guns "for the purpose of acquiring inventory" for sale at gun shows. ROA.4372. Fogle estimated that probably "several hundred" guns had "come into the house and out of house to gun shows" since the sideline business started, and that she received customers' payments through a mix of mobile payment apps (Cash App, Venmo, etc.) and cash. ROA.4371–72.

ATF's cataloguing of the many firearms found in the home confirmed Fogle's description of the guns as "inventory" instead of a personal collection. Indeed, 95 of the roughly 250 guns seized during the search did not even belong to Deare or Fogle; instead, they were firearms moved out of Dave's Gun Shop's inventory without a corresponding A&D book entry. ROA.4366.

### Pretrial Proceedings

The grand jury returned an indictment charging Deare and Fogle with conspiracy to engage in the business of dealing firearms without an FFL, in violation of 18 U.S.C. § 371 and 18 U.S.C. § 922(a)(1) (count 1). ROA.26. Deare also faced charges for making false statements in the records of a licensed firearms dealer (counts 2 and 3), with these charges being related to his falsification of Dave's Gun Shop's A&D book and his use of a straw purchaser to buy guns for transfer to the couple's illegal business. ROA.37–38.

Deare filed two motions to dismiss the indictment based on constitutional grounds. In his first motion, Deare alleged, in broad terms, that the "regulation of guns, including the rules pertaining to federal firearms license holders" violated the Second Amendment after the

Supreme Court's decision in *N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1 (2022). ROA.150–51. Deare's second motion to dismiss argued that 18 U.S.C. § 922(a)(1)(A)'s use of the term "engaged in the business" was unconstitutionally vague. ROA.158–59.

Both of these motions were accompanied by memorandums spanning only 1½ pages, with no substantive argument. ROA.150–51, ROA.158–59. The district court denied both motions. ROA.313–19, ROA.331.

### *Trial and Sentencing*

The district court held a jury trial for both defendants from November 27–30, 2023. Relevant to this appeal, the government presented considerable evidence establishing Fogle's "willful" intent. Some of the evidence focused on the dissonance between what Fogle told others the guns were (her "personal collection") and how she treated those guns privately (like business inventory). For example, testimony described how Fogle and Deare started selling the estate-sale military rifles at gun shows mere days after buying them. ROA.4179, ROA.4477. The government also introduced gun-show receipts seized from Deare and Fogle's home, many of which Fogle signed when completing the sale.

Some of these receipts even purported to be issued on behalf of "Dave's Gun Shop."[4] ROA.3475, ROA.3477, ROA.3482–83.

Other evidence focused on Deare and Fogle's financial picture, and how the gun-show sales effectively replaced Dave's Gun Shop as the couple's "primary source of income," despite the couple claiming at trial that their gun show sales were in furtherance of a "hobby." For example, a former Dave's Gun Shop employee testified that, by late 2020, Deare and Fogle had mostly abandoned the "buying, selling, and trading" of guns through Dave's Gun Shop, instead pivoting to off-book gun show sales as their main way to make money. ROA.4180–81. This employee described how he even traveled to Deare and Fogle's home to help price and label the 70 military rifles Fogle bought at the estate sale. ROA.4179–80. This employee further testified that Deare admitted he had taken to calling the gun-show inventory Fogle's "collection" only

---

[4] Deare, who testified at trial, provided an absurd explanation for why some receipts Deare and Fogle issued to gun-show customers were from "Dave's Gun Shop," while others were not. According to Deare, the nature of the couple's gun-show sales (i.e., commercial vs. personal) could vary from customer to customer, with Deare and Fogle apparently acting as the sole arbiters of this classification despite not performing background checks for any sales. ROA.4625 (Deare, after being confronted with same-date receipts signed by Fogle, one of which purported to be issued on behalf of Dave's Gun Shop: "Receipt [discrepancy] that shows what—if I was at the gun show in my personal capacity or if I was at the gun show in my gun shop's capacity[?]").

because Deare's name appeared on Dave's Gun Shop's FFL and thus would draw more scrutiny. ROA.4182–83. Multiple employees further described how they saw Fogle taking cash from the gun shop's cash safe (typically used only for inventory/consignment buys) or helping Deare load gun-shop inventory into the couple's trailer for transport to gun shows. ROA.4180–82, ROA.4027–28.

Some of the government's evidence focused specifically on Fogle's shifting description of the firearms at issue. To this end, a former Dave's Gun Shop employee testified that Fogle told him the guns she and Deare were selling were from her "personal collection" (even as, at trial, Fogle claimed to have no interest in collecting guns):

> Witness:     [Deare] would just claim [store inventory] as his personal collection and then he would take them to gun shows and sell them as Sarah's personal collection. . . .
>
> Prosecutor:  *What did Sarah Fogle tell you about those firearms being her personal collection?*
>
> Witness:     *Same thing.*

ROA.4227–28 (emphasis added).

Other testimony showed that Fogle herself did not even believe this "personal collection" cover story. Specifically, ATF Agent Kevin Allred

16

described how, during execution of the search warrant, Fogle confessed that "she had been buying and selling firearms for the purpose of acquiring more inventory" to sell at gun shows. ROA.4372. Agent Allred described how, according to Fogle,  probably "several hundred" guns had "come into the house and out of house to gun shows" as part of this inventory sell-down and resupply process. ROA.4371–72. The jury even got to see Deare and Fogle's extensive gun-show inventory, seized during the search warrant.



Gov. Exhibit 3, ROA.826.

The government also introduced evidence of motive, including evidence about the state-court judgment affecting the couple's finances. ROA.4455, ROA.4371–72. The jury heard how Fogle expressed anger at the store's previous owner, Dave, for obtaining this judgment, and how Deare admitted that he was trying find a way to "wait out" Dave's death

so he could once again own Dave's Gun Shop "free and clear." ROA.4025.

The government paired this evidence of motive with evidence from the

defendants' financial records, which showed Deare's and Fogle's gun-

show revenue matching (and its profits far outpacing) Dave's Gun Shop's

earnings in the period following the ATF inspection and the state-court

judgment. ROA.3645–46, ROA.4520–35.

The government even offered some evidence about Fogle's

knowledge of gun-industry laws. For example, the government

introduced Fogle's blog post (again, written two weeks before the ATF

"warning conference" Fogle attended), in which she discussed how "FFL

holders" must adhere to additional rules to be able to sell guns

commercially, even at gun shows, or risk losing their FFL license (i.e. the

FFL holder's "ability to operate their store and therefore [its owners']

livelihood"). ROA.3157. The jury further saw how, in this blogpost, Fogle

stated that some people might turn to unlicensed dealing, or "go

underground," in the face of overly demanding regulations on FFL

holders. ROA.3157.

Also, regarding Fogle's knowledge of FFL laws, ATF Agent Donna

Hurstell testified that Fogle herself attended the ATF "warning

conference" held for Dave's Gun Shop, at which agents discussed Dave's Gun Shop's many FFL violations. ROA.4073. The government also introduced a written summary of the violations discussed, and the corrective actions Deare promised to take to avoid serious ATF sanctions. ROA.855–56, ROA.4081–82.

On the final day of trial, the parties gave closing arguments. During the government's closing argument, the prosecutor sought to undermine Fogle's defense narrative—first discussed in opening statements and built on through cross-examinations—that she was totally disconnected from the "gun world," and thus had no idea that her conduct might be unlawful. ROA.4677. To this end, the prosecutor noted that Fogle herself attended the September 2019 ATF "warning conference" for Dave's Gun Shop, and thus heard the discussion between Deare and ATF about Dave's Gun Shop's many FFL violations. ROA.4665–66 (noting that ATF explained to Deare the rules he violated at the initial "closing conference," imparting what it meant to be "engaged in the business" as a consequence, and that the "same regulations are told over and over again" at the warning conference a month later).

The prosecutor also reminded the jury about Fogle's blog post, which showed a professional-level understanding of gun-industry laws, including the distinction between "FFLs" and "individual" sales, even at gun shows, and the fact that FFLs might lose their ability to sell guns for profit (i.e., their licensure) if they do not comply with gun laws. ROA.4666 (Prosecutor: "She's a smart woman. . . . In fact, less than about two weeks, maybe less than three weeks before that she wrote the article [discussing FFL rules and the consequences of violations]. You saw it. She knew. She knew what these rules were.").

Defense counsel did not object to these comments. During Fogle's own closing argument, however, defense counsel suggested that Fogle's presence at the warning conference did little to show "willful" intent, given that ATF Agent Hurstell's testimony did not describe in detail Fogle's level of participation or attentiveness at the conference. ROA.4678–79. As a result, during rebuttal, the government further contextualized the significance of evidence regarding Fogle's presence at the warning conference:

[Defense counsel] is right, Sarah Fogle was not required to be at the warning conference; but she was there. She was there. She heard the laws. She's a smart woman. And she wrote the article right before that. She doesn't need to know what specific law she's breaking. She only needs to know what she's doing is unlawful, and we've proven that.

ROA.4686.

The jury found Deare and Fogle guilty on all counts. ROA.4710. After the guilty verdict, the United States Probation Office prepared presentence investigation reports (PSRs) for both defendants. Relevant to this appeal, the PSR calculated a total offense level of 30 for Deare, which, combined with a criminal history score of I, resulted in a guidelines range of 97–121 months, with the guidelines further suggesting that the sentence be split across Deare's three counts of conviction to the extent necessary to achieve a "total punishment" within that range. ROA.5201.

The district court held a sentencing hearing for the defendants on April 2, 2024. ROA.4730. During this hearing, the district court heard how Deare had been violating gun laws even after his conviction, with Deare and Fogle trying to move a cache of guns to avoid forfeiture. ROA.4769. The district court ultimately sentenced Deare to a term of 45 months for count 1, 45 months for count 2, and 7 months for count 3,

leading to a "total punishment" sentence of 97 months (i.e., a low-end guideline sentence). ROA.4789. The district court sentenced Fogle to a guideline sentence of 60 months. ROA.4801. Both defendants filed timely appeals. ROA.663, ROA.5086.

## SUMMARY OF THE ARGUMENT

This Court should affirm in all respects. First, the district court did not err in denying Deare's motions to dismiss on Second Amendment and "vagueness" grounds, respectively. The Second Amendment does not protect commercial sales of firearms, only possession of guns for home protection and self-defense. Deare does nothing to explain how the seller laws at issue in this case have any effect on the right to "keep and bear" arms. Regardless, this country's historical tradition supports modest regulation of the commercial sale of arms, including the licensure and record-keeping requirements at issue here.

Deare's vagueness challenge also fails. Section 921(a)(21) contains a straight-forward and common-sense definition of what it means to be "engaged in the business" of dealing firearms. Regardless, Deare's conduct plainly constituted being "engaged in the business" of dealing firearms, thus defeating his vagueness challenge on an as-applied basis

22

(even if a different defendant at the margins of the statute might have more success with a vagueness challenge).

Turning to Fogle's arguments, sufficient evidence supported the jury's finding of "willfulness." Evidence at trial showed Fogle called her business's gun inventory a "personal collection," even as she treated it like commercial inventory in all respects. Further evidence showed that, in a moment of candor with ATF agents, Fogle admitted she viewed the couple's many guns as inventory, thus making clear she had been lying to others when calling the guns her "personal collection." Other evidence showed that Fogle had a comprehensive knowledge of gun laws, including what an "FFL holder" was and how the license granted its holder the ability to "operate a business" for "livelihood." This evidence of deception, coupled with evidence showing Fogle knew about the FFL requirement for commercial firearms dealing, easily allowed a "reasonable" jury to find that Fogle acted willfully, even if a different jury might somehow buy her claim that she knew nothing about the "gun world" and thus had no basis to know her conduct was unlawful.

In addition, the prosecutor did not "clearly or obviously" err under the plain error doctrine when describing the witness testimony about

what was discussed at the ATF "warning conference." ATF Agent Hurstell's testimony explained that a "warning conference" is necessarily a more in-depth discussion of the laws first reviewed at the earlier "closing conference," and documentary evidence admitted alongside the testimony made plain the discussion included a refresher on the relevant FFL rules. Even if the prosecutor did somehow plainly err in her description, however, Fogle cannot show an effect on her substantial rights because other evidence of "willfulness"—all more intuitive and compelling than having the definition of "engaged in the business" read aloud at a meeting—removes any "reasonable probability" that the prosecutor's comments affected the outcome of the trial.

Finally, Deare's sentence was not substantively unreasonable. Deare has done nothing to rebut the presumption that his low-end guideline sentence was reasonable. Instead, he merely disagrees with how the district court balanced its relevant considerations.

# ARGUMENT

## I. The district court did not err in denying Deare's motions to dismiss under the Second Amendment and the constitutional "vagueness" doctrine.

## A. Standard of Review

This Court "review[s] preserved challenges to the constitutionality of a criminal statute de novo." *United States v. Howard*, 766 F.3d 414, 419 (5th Cir. 2014). Where, however, a defendant fails to raise the constitutionality of a statute in the district court—or, on appeal, makes entirely new arguments regarding that issue—review is for plain error. *See United States v. Lozano*, 791 F.3d 535, 537 (5th Cir. 2015). "Plain error" is (1) error, (2) that is clear or obvious, and (3) that affects substantial rights. *United States v. Olano*, 507 U.S. 725, 732 (1993). Even if these conditions are satisfied, however, this Court should not exercise its discretion to correct a forfeited error unless the error "seriously affect[s] the fairness, integrity or public reputation of judicial proceedings." *Id.*

## B.    Applicable Substantive Law

### 1.    *18 U.S.C. § 922(a)(1)*

Section 922(a)(1)(A) of Title 18 of the United States Code makes it "unlawful for any person except a . . . licensed dealer, to engage in the business of . . . dealing firearms . . . ." 18 U.S.C. § 922(a)(1)(A). Elsewhere, the statute defines the term "engaged in the business" to involve "a person who devotes time, attention, and labor to dealing in firearms as a regular course of trade or business to predominantly earn a profit through the repetitive purchase and resale of firearms." 18 U.S.C. § 921(a)(21). The same provision sets forth an exception to this more general definition, stating that "such term [i.e., 'engaged in the business'] shall not include a person who makes occasional sales, exchanges, or purchases of firearms for the enhancement of a personal collection or for a hobby, or who sells all or part of his personal collection of firearms."). *Id.*

Finally, § 921(a)(23) provides even further guidance about what a "principal objective of livelihood and profit" is, stating that the phrase "means that the intent underlying the sale or disposition of firearms is predominantly one of obtaining livelihood and pecuniary gain, as opposed

to other intents, such as improving or liquidating a personal firearms collection." 18 U.S.C. § 921(a)(23).

### 2. *The Second Amendment and Commercial Firearms Sales*

The Second Amendment, by its plain language, is concerned with the right to possess and carry guns—that is, the right to "keep and bear arms"—not the ability to sell guns for profit. U.S. CONST. amend. II ("[T]he right of the people to keep and bear Arms, shall not be infringed."); *see also Dist. of Columbia v. Heller*, 554 U.S. 570, 582 (2008) ("[T]he most natural reading of 'keep Arms' . . . is to 'have weapons.'"). Tracking this plain language, at least one circuit court has held that the Second Amendment does not create a separate "right to sell firearms" for a commercial vendor's own sake. *See Teixeira v. County of Alameda*, 873 F.3d 670, 690 (9th Cir. 2017) (en banc) ("[T]he Second Amendment does not independently protect a proprietor's right to sell firearms."). Instead, a firearms dealer may bring a Second Amendment challenge only where he shows that the law at issue actually burdens customers' core Second Amendment right. *See id*.

Although the Supreme Court recently revisited its Second Amendment jurisprudence in *N.Y. State Rifle & Pistol Ass'n, Inc. v.*

*Bruen*, 597 U.S. 1 (2022), the Supreme Court's holding, on its face, was concerned with only those laws that might affect the right to "keep and bear" arms, and thus is irrelevant to those laws governing only seller conduct. *See Bruen*, 597 U.S. at 17 ("In keeping with *Heller*, we hold that *when the Second Amendment's plain text covers an individual's conduct*, the Constitution presumptively protects that conduct (emphasis added)); *see also id.* at 81 (Kavanaugh, J., concurring) (asserting that nothing in *Bruen* casts doubt on laws that impose "conditions and qualifications on the commercial sale of arms").

### 3.  *Constitutional Vagueness Doctrine*

Under the vagueness doctrine, "[a] conviction fails to comport with due process if the statute under which it is obtained fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement." *United States v. Williams*, 553 U.S. 285, 304 (2008). This inquiry is a simple one: if a person can, through "ordinary common sense," have a fair idea of what the statute makes criminal, the statute is not unconstitutionally vague. *See Broadrick v. Oklahoma*, 413 U.S. 601, 608 (1973).

28

Moreover, federal courts must always begin with an "as-applied" analysis when assessing vagueness challenges and must reject a defendant's claim where his conduct falls squarely within the challenged law's prohibitions even if a different, hypothetical defendant might mount a more compelling argument that the statute is unclear regarding less obviously criminal conduct. *See Holder v. Humanitarian Law Project*, 561 U.S. 1, 18–19 (2010) ("We consider whether a statute is vague as applied to the particular facts at issue, for a plaintiff who engages in some conduct that is clearly proscribed cannot complain of the vagueness of the law as applied to the conduct of others." (cleaned up)).

## C.    Application of the Law to the Record

Deare argues that the district court erred in denying both of his motions to dismiss, which, again, raised a Second Amendment claim and a vagueness challenge. As an initial matter, Deare's arguments in the district court were likely so cursory as to warrant application of the plain error standard of review on appeal. Neither of Deare's motions contained any real argument, and each motion's lone case citation did nothing past confirming the existence of the Second Amendment and the constitutional vagueness doctrine.

On appeal, such short treatment would result in waiver because neither the Court nor the government is expected to make arguments on a defendant's behalf. *See United States v. Lindell*, 881 F.2d 1313, 1325 (5th Cir. 1989) (stating that failure to make substantive argument with at least some citation to authority constitutes waiver). It follows naturally that, in the district court, it should result in forfeiture. At a minimum, the "new" aspects of Deare's constitutional claims must be reviewed for plain error. *See United States v. Daniels*, 252 F.3d 411, 415 (5th Cir. 2001).

### 1. *The district court did not err in denying Deare's* Bruen-*based motion to dismiss.*

As stated, the Second Amendment does not protect commercial sales of firearms for its own sake; this alone defeats Deare's *Bruen* argument on appeal. *See Teixeira*, 873 F.3d at 690. Indeed, Deare seemingly concedes that the licensure and record-keeping laws at issue do nothing, on their face, to limit a person's right to "keep and bear" arms. Instead, Deare urges, for the first time on appeal, that the Second Amendment permits his challenge because the record-keeping laws prevented Deare from carrying out "ancillary conduct necessary to the core right" to firearm possession. *See* Deare's Brief, at 11.

This argument fails. This Court must assess Deare's Second Amendment claim in an "as-applied" context, with the challenge failing if Deare's conduct does not implicate the Second Amendment's protections. *See United States v. French*, 121 F.4th 538 (5th Cir. 2024) ("As the Supreme Court has recently reminded, courts must apply the *Salerno* test to every facial challenge not based on the First Amendment. Under *Salerno*, French must establish that no set of circumstances exists under which the law would be valid." (cleaned up)). Deare does nothing to explain how his unlawful conduct—best summarized as (1) the running of a commercial firearms business without an FFL (count 1); (2) the refusal to keep accurate "A&D" transfer records at both Dave's Gun Shop and his unlicensed business (count 2); and (3) the using of a straw purchaser to buy a handgun from Dave's Gun Shop's inventory, thus avoiding creation of an ATF-4473 "background check" record linking Deare's name to future gun-show inventory—was "necessary" to further his customers' "core right" to firearm possession. The laws at issue, if followed, do absolutely nothing to restrict customers' ability to obtain arms for personal use, and thus do not implicate the Second Amendment even indirectly.

In keeping with *Bruen*, this Court has held that "shall issue" licensing/permit regimes are presumed lawful, and that the challenger bears the burden of explaining why a licensing regime that does not purport to limit firearm possession rights nevertheless implicates the Second Amendment by way of burdening the core right to firearm possession.[5] *See McRorey v. Garland*, 99 F.4th 831, 838 (5th Cir. 2024). ("The right to 'keep and bear' can implicate the right to purchase. . . . But such an implication is not the same thing as being covered by the plain text of the amendment."); *see also id.* at 839 (stating that, since challengers bear the burden under *Bruen*'s first step, they must show that "shall issue" licensing regimes, which are "presumptively lawful" after *Bruen*, have been "put[] towards abusive ends"). Again, past a conclusory statement, Deare has not even attempted to do so here, thus dooming his Second Amendment claim without more (especially under the demanding "plain error" standard of review).

---

[5] At least for the purposes of this appeal, the FFL issuance scheme is a "shall issue" one. Although obtaining an FFL is predicated on many of the same gun-possession prohibitions found in 18 U.S.C. § 922(g), none of those affected Deare. He was entitled to a license as long as he followed the basic record-keeping and vendor rules that went with it. *See* ROA.863 (Dave's Gun Shop's FFL application, which shows no statutory impediment preventing issuance).

Even assuming that the seller-based laws here implicate Second Amendment conduct, Deare's arguments still fail because this country has a long "history and tradition" of regulating firearms sales. *See Teixeira*, 873 F.3d at 670 (stating that "[n]otably, colonial government regulation included some restrictions on the commercial sale of firearms," and collecting colonial-era laws banning sales to Indian tribes). In fact, the colonial governments themselves were often in charge of storing or distributing firearms for militia purposes—a scenario that necessarily shows founding-era approval for government regulation of the sale or transfer of arms. *See id.* ("The government provided and stored guns, controlled the conditions of trade, and financially supported private firearms manufacturers." (cleaned up)). Finally, at least some colonies and early American states imposed record-keeping and licensure requirements on those that dealt in firearms as a trade. *See, e.g.*, William Henry Whitmore, The Colonial Laws of Massachusetts (1890) (regulating unlicensed transportation of gunpowder in 1651); The Charter and Ordinances of the City of Providence, Together with the Acts of the General Assembly Relating to

the City 89 (prohibiting unlicensed sales of gunpowder in Providence, Rhode Island in 1821).[6]

In sum: Founding-era legislatures understood that they had the power to outright bar the sale of guns where they perceived a risk associated with it. Requiring modern firearms dealers to submit to a basic licensure and record-keeping scheme—neither of which directly restricts a person's ability to sell guns at all—is a modest regulation in comparison. As the Supreme Court has instructed, for purposes of "history and tradition" analysis, "greater" restrictions on gun rights necessarily include "lesser" ones bent towards the same ends. *See United States v. Rahimi*, 602 U.S. 680, 699 (2024) ("[I]f imprisonment was permissible to respond to the use of guns to threaten the physical

---

[6] Although unnecessary to resolve this appeal, another complication to Deare's argument is that, at the time of the founding, most "new" guns were sold by British merchants, with colonial firearms trade revolving around the repair of existing weapons, not the importation and sale of new ones. In other words, colonial legislatures could not impose record-keeping and licensure laws on the main "firearms dealers" even if they wanted to: those merchants were within the jurisdiction of the soon-to-be enemy, Great Britain. *See generally* Kevin Sweeney, *An Eighteenth-Century Gun Culture Shaped by Constraints*, Duke Center for Firearms Laws (September 6, 2023), *available at* https://firearmslaw.duke.edu/2023/09/an-eighteenth-century-gun-culture-shaped-by-constraints (last visited January 5, 2025).

safety of others, then the lesser restriction of temporary disarmament that Section 922(g)(8) imposes is also permissible.").[7]

### 2. The district court also did not err in rejecting Deare's vagueness challenge.

Deare's vagueness challenge fares no better. Contrary to Deare's argument, 18 U.S.C. § 921(a)(21) provides a detailed and common-sense definition of "engaged in the business" of firearms dealing: it requires the "regular . . . trade or business" of "repetitive . . . sales" of guns, with the person making these repetitive sales doing so for the "principal objective" of making "profit" and "livelihood." *See* 18 U.S.C. § 921(a)(21). The statute even exempts those who instead make sales for the purpose of liquidating or enhancing a personal collection. *See id.* There is nothing obtuse or counterintuitive about this definition such that an "ordinary" person would not understand it; indeed, the term is almost self-defining: a person is "engaged in the business" of selling guns if, just as any other retail business, he makes sales repeatedly and regularly for the main purpose of earning a profit.

---

[7] That the district court did not err in denying Deare's Second Amendment-based motion to dismiss also defeats his supposed challenge to the "sufficiency of the evidence" supporting his convictions, since the entirety of the argument is that evidence was admitted towards a supposedly unconstitutional charge. *See* Deare's Brief, at 19.

But this Court need not consider these broader issues to reject Deare's vagueness challenge to § 922(a)(1)(A). This is because Deare's vagueness challenge fails on an as-applied basis. Deare sold hundreds of guns at gun shows. The inner workings of his unlicensed business involved acquiring new guns for sale, selling those guns in a commercial setting, and quickly replenishing inventory through fresh purchases before selling down stock again. Over the course of the conspriracy, Deare made more personal profit doing this than he made through his admittedly commercial business, Dave's Gun Shop. Deare even sold guns he did not own, instead pilfering them from the consignment rack at Dave's Gun Shop. ROA.4366.

There is nothing marginal or debatable about whether this conduct falls within § 922(a)(1)(A)'s prohibitions. It is, by all accounts, a heartland example of what the statute prohibits. *See United States v. Strunk*, 551 F. App'x 245, 246 (5th Cir. 2014) (rejecting on an as-applied basis vagueness challenge brought by a defendant who did not even own the guns he sold, but instead acted as a consignment agent, just like Deare did for a portion of his unlicensed sales); *see also United States v. Shipley*, 546 F. App'x 450, 456 (5th Cir. 2013) (rejecting a vagueness

challenge to § 922(a)(1)(A) by a defendant who made, "over a number of years, numerous repetitive sales in quick succession, sometimes to repeat customers").[8]

Finally, on appeal, Deare adds a new component to his "vagueness" challenge, asserting that the Supreme Court's decision in *Loper Bright Enters. v. Raimondo*, 603 U.S. 369 (2024), somehow renders 18 U.S.C. § 922(a)(1)(A) unconstitutionally vague. *See* Deare's Brief, at 13–15. This argument is meritless, especially under the plain error standard of review. *See United States v. Blount*, 906 F.3d 381, 384 (5th Cir. 2018) ("Ordinarily, an error is not plain when the court has not previously addressed the issue at hand."). *Loper Bright* held that judges need not defer to an agency's interpretation of an otherwise ambiguous law. *See Loper Bright*, 603 U.S. at 412. There is nothing in this record suggesting the district court "deferred" to an agency interpretation of § 922(a)(1) because it felt bound to do so, despite a disagreement with the agency's

---

[8] In addition, § 922(a)(1)'s inclusion of a "willfulness" standard also helps defeat Deare's vagueness challenge. The vagueness doctrine is, in large part, concerned with giving a person fair notice that his conduct is unlawful. When a person acts "willfully," he categorically already knows this, even if he does not also understand the finer points of the law at issue. *See United States v. Zhen Shou Wu*, 711 F.3d 1, 15 (1st Cir. 2013) ("Where a statute explicitly provides that a criminal violation of its terms must be 'willful,' the void-for-vagueness doctrine is especially inapposite, since the statute itself ensures that good-faith errors are not penalized." (cleaned up)).

view. In fact, the district court's jury instructions did not use agency interpretations at all, instead directly quoting the statutory definition of "engaged in the business" without additional interpretation. ROA.4700–01. This alone defeats Deare's unpreserved—and self-contradictory—*Loper Bright* argument.

**II. Sufficient evidence supported the jury's conclusion that Fogle acted "willfully," including evidence that Fogle lied about the true nature of her firearm "personal collection" and evidence showing she had a comprehensive knowledge of FFL laws.**

**A. Standard of Review**

Fogle preserved her sufficiency argument by raising a Rule 29 motion at the close of the government's case and at the end of evidence. ROA.4564, ROA.4656. Accordingly, this Court should review de novo the district court's denial of Fogle's motion for acquittal based on insufficient evidence and consider whether "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). In conducting this inquiry, this Court views the evidence in the light most favorable to the prosecution. *United States v. Stevenson*, 126 F.3d 662, 664 (5th Cir. 1997). Accordingly, "[t]he evidence need not exclude every reasonable

hypothesis of innocence or be wholly inconsistent with every conclusion except that of guilt." *Id*; *see also United States v. Alaniz*, 726 F.3d 586, 601 (5th Cir. 2013) ("[T]his Court's inquiry is limited to whether the jury's verdict was reasonable, not whether [the Court] believe[s] it to be correct.").

## B. Applicable Substantive Law

Although not expressly in the statute, this Court has held that 18 U.S.C. § 922(a)(1)(A) requires the government show that a defendant "willfully" engaged in the business of dealing firearms without a license. *See Strunk*, 551 F. App'x at 246. Fogle was charged with conspiracy to commit this crime under 18 U.S.C. § 371—a statute that, itself, requires a showing that the defendant acted "willfully," or with the intent to further the conspiracy's unlawful goal. *See* Fifth Cir. Pattern Jury Instr. (Criminal) § 2.15A (2019).

A defendant acts "willfully" when she undertakes the proscribed conduct "voluntarily and purposely with the specific intent to do something the law forbids; that is to say, with bad purpose either to disobey or disregard the law." *See United States v. Nora*, 988 F.3d 823, 830 (5th Cir. 2021). "Willfulness," however, does not require the

defendant to be aware of the specific law she is breaking. *See id.* at 830 n.3.

## C.    Application of Law to the Record

Fogle argues there was insufficient evidence to show she acted "willfully." Fogle focuses exclusively on two pieces of evidence: (1) ATF Inspector Hurstell's testimony regarding the subject matter of the "warning conference" Fogle was present for; and (2) the content of Fogle's blog post. Fogle suggests that the value of this evidence was overstated and, when viewed "correctly," there was insufficient evidence to support the jury's verdict.

Fogle is wrong about this, but that is irrelevant to sufficiency analysis. The government offered overwhelming evidence showing that Fogle acted with "bad purpose," or with intent to "disregard the law," apart from this challenged evidence. Most obviously, evidence at trial showed that Fogle consistently told others—or stood by as her husband told others—that their gun show inventory was part of a "personal collection," even as she treated the guns in a manner indistinguishable from commercial inventory. ROA.4227–28. For example, Fogle began selling off the 70 military rifles she bought from the estate sale for her

supposed "personal collection" mere days after buying them. ROA.4179, ROA.4477. Much of the "personal collection" found in Fogle's home bore price tags or was arranged as if being displayed for customers. Evidence at trial also showed that a large portion of this "personal collection" came from Dave's Gun Shop's inventory, with the jury hearing how Fogle helped load guns from the store for transport to gun shows and how Fogle herself took cash from the store's safe. ROA.4180–82, ROA.4027–28. Documentary evidence submitted at trial even showed that Fogle issued gun-show receipts that purported to be on behalf of "Dave's Gun Shop"— a deceptive action wholly inconsistent with her statements to others that the guns she and Deare sold at gun shows were part of a "personal collection."[9] ROA.3475, ROA.3477.

A jury asked to weigh the gap between what Fogle told others these guns were (a "personal collection") and how she treated them (as business inventory), cannot be considered "unreasonable" in deciding that Fogle herself did not believe the guns were part of a "personal collection" and instead used that description to hide her and her husband's unlawful

---

[9] At trial, Fogle's counsel urged the jury to believe that Fogle had no real connection to Dave's Gun Shop. ROA.4679. Accordingly, this Court should reject any attempts to now claim that the jury was unreasonable in not discounting these receipts as somehow connected to sales under Dave's Gun Shop's FFL.

conduct. *See Cheek v. United States*, 498 U.S. 192, 203–204 (1991) (noting that "the more unreasonable" a defendant's "asserted beliefs or misunderstandings are," especially as measured against objective criteria, "the more likely the jury . . . will find that the Government has carried its burden" in proving intent).

But this common-sense inference is not the entirety of the evidence showing Fogle lied when describing the guns as a "personal collection" to others, instead using the term to hide her illegal activity. As stated, Fogle herself effectively admitted so when confessing to ATF agents that she bought the guns "for the purpose of acquiring inventory" and that she and Deare had moved "hundreds" of them through their revolving door of gun-show inventory acquisition and sell-down. ROA.4371–72; *see also United States v. Calles*, 482 F.2d 1155, 1160 (5th Cir. 1973) (noting that inconsistent statements or false explanations can be powerful evidence of willfulness).

Deare even admitted that his and Fogle's "personal collection" cover story was a lie to distance his own name from the unlicensed sales. ROA.4182–83. Although Fogle urges that there is no evidence Deare told her this as well, that is besides the point: the jury was free to use

inference and circumstantial reasoning to decide that Fogle—an intricate part of the unlicensed business's operation and someone who, herself, treated the guns as inventory even as she called them a "personal collection" to others—was very much in on the ruse. *See United States v. Marchetti*, 96 F.4th 818, 828 (5th Cir. 2024) (noting that a defendant's high-ranking role in a business enterprise, coupled with her participation in unlawful activity, makes it less credible that she did so without knowledge of the fraud).

And there is far more evidence suggesting Fogle acted deceptively or otherwise adopted the "personal collection" cover story with "bad purpose." This included her motive to sell guns unlawfully to avoid the effects of the state court judgment, her bank statements showing she and Deare made their primary income off this supposed "hobby," and Fogle's own involvement in handling Dave's Gun Shop's assets and cash (again, she likely got the $20,000 to buy the estate-sale guns from the gun shop's cash safe). ROA.4371–72, ROA.3645, ROA.4180–82, ROA.4027. Although Fogle pitched a narrative at trial that she honestly believed the guns were part of her husband's personal collection (not her own, itself a contradiction to her earlier claims), the jury was free to reject this

explanation, even if a different, hypothetical jury might be swayed by it. *See United States v. Meza*, 701 F.3d 411, 422–23 (5th Cir. 2012) (noting that juries are always free to choose between multiple "reasonable constructions of the evidence").

Again, Fogle ignores all this evidence, instead claiming that sufficiency analysis must turn on the value of Agent Hurstell's testimony and Fogle's blog post, with Fogle urging neither shows she understood that selling guns without a license might be unlawful, much less the exact contours of what it means to be "engaged in the business" of selling guns versus selling in furtherance of a personal collection. *See* Deare's Brief, at 13–15.

This argument fails, even assuming these pieces of evidence were necessary to clear the low "sufficiency" bar for purposes of a Rule 29 motion. Regarding the blog post, it shows (1) Fogle not only had a strong knowledge of gun-industry laws generally, but even knew exactly what an "FFL holder" was; (2) she knew ATF had the authority to rescind an FFL under certain circumstances, thus making it unlawful for the business to sell guns (i.e., take its "ability to operate") and imperiling the owners' "livelihood"; and (3) she acknowledged ways of going

"underground" with commercial gun sales, pairing that insinuation with a statement regarding the "gun show loophole" for "individual" sales from personal collections. ROA.3157.

And Fogle's arguments regarding Agent Hurstell's testimony are even less convincing. Agent Hurstell testified that Fogle attended an ATF "warning conference" where her husband, Deare, was expected to provide a plan for preventing future FFL violations at Dave's Gun Shop. The whole purpose of this meeting was to make sure Deare understood there could be serious consequences for continued deficiencies, which obviously included FFL revocation as the ultimate consequence should the violations not be corrected. That Fogle understood this too is a basic inference any jury could make, especially when paired with the evidence of the many violations ATF discussed with Deare, and Fogle's own clear knowledge of "FFL" rules. ROA.855–57 (detailed summary of the many rules and violations ATF discussed with Deare at the ATF "warning conference").

Fogle's arguments regarding Agent Hurstell's testimony also suffer for other reasons, though the Court may affirm her conviction without considering them. First, she ignores the "personal collection" carve out is

likely an affirmative defense (not an element of the crime) and thus not a relevant concern for this Court's evidentiary sufficiency review. By nature of the jury's guilty verdict, it necessarily rejected the claim that Fogle's conduct involved a real or perceived "personal collection."[10] More importantly, Fogle's suggestion that, as a matter of law, there had to be evidence showing she understood the exact contours of the definition of "engaged in the business" alludes to the "heightened willfulness" standard at play only in tax cases. *See Nora*, 988 F.3d at 830 (reminding that a defendant acts "willfully" so long as she knows her conduct is unlawful, regardless of whether she knows exactly what law she is breaking).

Finally, Fogle ignores the illogic of her argument. During the course of the conspiracy, Fogle herself insisted the hundreds of guns she and Deare bought and sold like business inventory were nevertheless part of a "personal collection." A jury could reasonably conclude that, to make

---

[10] A statute that sets forth a limited exception to a general rule creates an affirmative defense, not a further portion of an element of the offense itself. *See United States v. Wise*, 221 F.3d 140, 148 (5th Cir. 2000) (noting the "well-established rule of criminal statutory construction that an exception set forth in a distinct clause or provision should be construed as an affirmative defense and not as an essential element of the crime."); *see also United States v. Brannan*, 98 F.4th 636, 638–40 (5th Cir. 2024) (applying principle to 28 U.S.C. § 5845(f)'s definition of "destructive device," which is placed and prefaced almost identically to § 921(a)(21)'s "personal collection" carve-out).

such an odd claim while otherwise treating the guns like business inventory, Fogle had to have already been aware of § 921(a)(21)'s "personal collection" safe harbor; otherwise, she would have just told others the truth, as shown by her own conduct: the guns were commercial inventory being sold for profit. *See Marchetti*, 96 F.4th at 828 (noting, in a healthcare fraud case, that the defendant's efforts to disguise unlawful percentage-based compensation as something else was indicative of willfulness).

> **III. The prosecutor's closing argument remarks about ATF Agent Hurstell's testimony were not "clearly or obviously" a reference to facts not in evidence. Regardless, given the other unchallenged evidence of "willfulness," Fogle cannot show an effect on her substantial rights.**

## A.    Standard of Review

This Court must review Fogle's "improper closing remarks" argument for plain error because she did not object at trial to the prosecutor's description of the evidence in closing. *See United States v. Lara*, 23 F.4th 459, 479 (5th Cir. 2022).

## B.    Applicable Substantive Law

When giving a closing argument, a prosecutor should generally limit herself to "discussing properly admitted evidence and any

reasonable inferences or conclusions that can be drawn from that evidence." *United States v. Vargas*, 580 F.3d 274, 278 (5th Cir. 2009). Closing argument is, however, for argument. Thus, a prosecutor is free to, within reason, use "oratory and hyperbole" when describing admitted evidence. *See United States v. Boyd*, 773 F.3d 637, 645 (5th Cir. 2014) ("[C]losing argument is just that—argument—we allow prosecutors to use expressive language and a bit of oratory and hyperbole." (cleaned up)).

Moreover, the presence of a potentially inappropriate closing remark does not, by itself, entitle a defendant to relief. Instead, this Court will reverse only when the allegedly inappropriate closing remark "cast[s] serious doubt on the correctness of the jury's verdict." *United States v. Iredia*, 866 F.2d 114, 117 (5th Cir. 1989) ("A criminal conviction is not to be lightly overturned on the basis of a prosecutor's comments standing alone. The determinative question is whether the prosecutor's remarks cast serious doubt on the correctness of the jury's verdict.").

## C.    Application of the Law to the Record

Fogle argues that, setting aside whether sufficient evidence existed to support her conviction, the prosecutor's comments about the content

of Agent Hurstell's testimony were "clear or obvious" error under the plain error doctrine. Fogle urges that the prosecutor overstated the content of Agent Hurstell's testimony about the "warning conference" and what laws were discussed during it, with Fogle claiming that Agent Hurstell's testimony stated that the definition of "engaged in the business" was discussed at the earlier "closing" conference, for which Fogle was absent. ROA.833–35. *See* Fogle's Brief, at 14–15, 17–18. Fogle further suggests that the sequencing of Agent Hurstell's direct examination, together with the government's opening statement, further clouded the issue, allowing her to show an effect on her substantial rights. *See* Fogle's Brief, at 19–20.

These arguments lack merit for multiple reasons. First, contrary to Fogle's claims, the prosecutor's comments were not a "clear or obvious" reference to facts not in evidence. Agent Hurstell explained that a "warning conference" is, by definition, a deeper dive into an FFL holder's violations than that of the more standard post-inspection "closing" conference. ROA.4073. She explained that the purpose of the "warning conference" is to further review and reinforce rules previously touched on at the closing conference. ROA.4073. The government even offered a

49

multi-page summary of the warning conference's topics, detailing how ATF went through at least sixteen statutory and regulatory violations during the warning conference, all of which were predicated on the fact that Dave's Gun Shop was an FFL holder "engaged in the business" of dealing firearms. ROA.855–57. Indeed, many of the violations discussed were rooted in a section of the Code of Federal Regulations (27 C.F.R. § 478) that contains the definition of "engaged in the business." ROA.855–57. Finally, during cross-examination, Agent Hurstell also clarified that revocation of Dave's Gun Shop's FFL was a possible punishment should Deare not follow through on his commitment to correct the violations, making plain that the FFL is what allowed a person to sell firearms commercially. ROA.4081–82.

Again, when making closing argument, a prosecutor is permitted to draw any reasonable conclusions from the evidence, and to be forceful and expressive when doing so. *See United States v. Bennett*, 874 F.3d 236, 251 (5th Cir. 2017). The government's comments here were exactly that: a shorthand way of underscoring that Fogle was in the room for an ATF conference where officials explained the many statutes and regulations Dave's Gun Shop violated, all of which were violations only because the

Gun Shop was an FFL holder "engaged in the business" of dealing guns. Fogle's own attorney did not see a problem with the government's description of Agent Hurstell's testimony, failing to object despite his own cross-examination showing he understood that Deare's signed "acknowledgment of rules" document came from the earlier "closing conference," not the "warning conference" Fogle attended, where the gun shop's violations were discussed in greater detail. *See* ROA.4084 (defense counsel's cross-examination, during which Agent Hurstell expressly told him—and thus the jury—that the signed document (ROA.833–35) came from the post-inspection "closing conference," not the more serious and intensive "warning conference" that followed).

But even assuming the prosecutor's comments somehow caused "clear or obvious" error, Fogle still cannot show an effect on her substantial rights. This is because, as discussed previously, there was overwhelming evidence showing Fogle knew she was acting unlawfully, thus preventing Fogle from meeting her burden of establishing a "reasonable probability" that the allegedly improper comments affected the jury's verdict. *See United States v. Gonzalez-Rodriguez*, 621 F.3d 354, 363 (5th Cir. 2010) ("Error is prejudicial [for the purposes of plain error

review's substantial rights analysis] if there is a reasonable probability that the result of the proceedings would have been different but for the error.").

Furthermore, district court's instruction that the lawyers' arguments were "not evidence" removed any possibility that the jury privileged the prosecutor's comments over the actual evidence when reaching a conviction. ROA.4690 (District Court: "The questions, statements, objections, and arguments by the lawyers are not evidence."); *see also United States v. Patino-Prado*, 533 F.3d 304, 313 (5th Cir. 2008) ("We will presume that jurors understand and follow their instructions, abandoning that presumption only when there is an overwhelming probability that the jury will be unable to follow the instruction and there is a strong probability that the effect is devastating." (internal quotation marks omitted)).

In sum, there was considerable alternative evidence of Fogle's "willfulness," all of which was more compelling than whether a definition was read aloud to Deare while Fogle was in the room. Fogle's suggestion to the contrary again hints at her misplaced view that she needed to have knowledge of the exact law she violated to be guilty—an overstatement

of the "willfulness" standard that downplays all the other evidence or deceit or guilty knowledge. Accordingly, Fogle cannot show that the prosecutor's comments, even if somehow improper, affected the outcome of the case.

## IV. Deare's low-end guideline sentence was not substantively unreasonable.

### A. Standard of Review

This Court reviews the substantive reasonableness of a defendant's sentence for an abuse of discretion. *United States v. Diehl*, 775 F.3d 714, 724 (5th Cir. 2015). That process is "highly deferential" to the district court, "because the sentencing court is in a better position to find facts and judge their import under the § 3553(a) factors with respect to a particular defendant." *Id*.

### B. Applicable Substantive Law

When considering whether a sentence is substantively reasonable, this Court considers "the totality of the circumstances" surrounding the sentence imposed. *See United States v. Rhine*, 637 F.3d 525, 529 (5th Cir. 2011). Although a district court must consider each of the sentencing factors in § 3553(a), it need not assign them equal weight, nor expressly recite each of the factors when rendering sentence. *United States v.*

*Alvarado*, 691 F.3d 592, 597 (5th Cir. 2012); *see also United States v. Smith*, 440 F.3d 704, 707 (5th Cir. 2006).

This Court grants significant deference to the district court's determination of the appropriate sentence based on the § 3553(a) factors and does not vacate a sentence simply because it would have imposed a different one. *United States v. McElwee*, 646 F.3d 328, 337 (5th Cir. 2011). Moreover, a sentence within the properly calculated Guidelines range is presumptively reasonable. *United States v. Tuma*, 738 F.3d 681, 695 (5th Cir. 2013). To rebut this appellate presumption, a defendant must show that "the district court improperly considered a factor, failed to take into account a factor, or made a clear error in balancing the factors." *See id.*

## C.    Application of the Law to the Record

Finally, Deare contests the substantive reasonableness of his low-end guideline sentence of 97 months. Deare argues that he was a "first-felony" offender, and that his crime was "non-violent" and "victimless." *See* Deare's Brief, at 15. That Deare can point to mitigating factors, however, does nothing to rebut the appellate presumption that his within-guideline sentence was substantively reasonable. *See Tuma*, 738 F.3d at 695.

The record shows that the district court considered these mitigation arguments before rejecting them over aggravating concerns. *See* ROA.4783–85. The district court had good reason to reject them: even after his conviction, Deare continued to flout gun laws, with Deare being captured on recorded jail calls trying to get Fogle (who was on bond pending sentencing) to hide a gun cache at a third party's home so he could avoid forfeiture of the guns and reclaim them after his release from prison as a convicted felon. ROA.3915–19 (government sentencing memorandum, containing transcript of recording). As the district court noted just before pronouncing sentence, Deare's "lack of respect" for the law and the judicial process advocated against a downward variance.[11] ROA.4788.

---

[11] In his brief, Deare purports to challenge a host of offense-specific guideline enhancements, claiming, in cursory fashion, that all of them violate the Second Amendment after *Bruen*. This argument is even less convincing that Deare's *Bruen*-based motion to dismiss. Sentencing enhancements, definitionally, apply to criminal conduct, and the Second Amendment never protects criminal activity with a firearm. If the crime of conviction is constitutional, so are any sentencing enhancements that follow in its wake. Moreover, the very novelty of these challenges defeats them under plain error review. *See Blount*, 906 F.3d at 384. Although Deare mentioned a "Second Amendment" challenge to the PSR's calculation of Deare's guideline range, he never focused on a specific enhancement nor offered any substantive argument (again, simply case citations, with an expectation that the district court finish the argument on its own). ROA.5155.

At bottom, Deare merely disagrees with the way the district court balanced its various sentencing considerations. This disagreement, however, does not overcome the presumption of reasonableness that applies to his within-guideline sentence. *See Alvarado*, 691 F.3d at 597 (finding no abuse of discretion regarding the district court's within-guideline sentence and noting that the defendant's "mere belief that the mitigating factors presented for the court's consideration should have been balanced differently is insufficient to disturb [the] presumption [of reasonableness]"). Accordingly, the district court did not impose a substantively unreasonable sentence.

## CONCLUSION

This Court should affirm in all respects.

Respectfully submitted,

BRANDON B. BROWN
United States Attorney

BY: *s/ T. Forrest Phillips*

T. FORREST PHILLIPS
AL Bar # 3736E29R
Assistant United States Attorney
800 Lafayette Street, Suite 2200
Lafayette, LA 70501
(337) 262-6618

## CERTIFICATE OF SERVICE and
## COMPLIANCE WITH ECF FILING STANDARDS

I hereby certify that a copy of the foregoing Brief on Behalf of Appellee, The United States of America, was filed electronically with the Fifth Circuit Court of Appeals using the electronic filing system. Notice of this filing will be sent to counsel of record either by operation of the court's electronic filing system and/or via United States Mail to:

Mr. Christopher A. Aberle
P. O. Box 8583
Mandeville, LA 70470-8583

Mr. Andre' Robert Belanger
MANASSEH, GILL, KNIPE & BELANGER, P.L.C.
8075 Jefferson Highway
Baton Rouge, LA 70809

In addition, I hereby certify that: (1) all required privacy redactions have been made pursuant to 5th Cir. R. 25.2.13; (2) the electronic submission is an exact copy of the paper document pursuant to 5th Cir. R. 25.2.1; and, (3) the document has been scanned for viruses with the most recent version of a commercial virus scanning program and is free of viruses.

Lafayette, Louisiana, this the <u>6th</u> day of January, 2025.

BY:  *s/ T. Forrest Phillips*

T. FORREST PHILLIPS
AL Bar # 3736E29R
Assistant United States Attorney
800 Lafayette Street, Suite 2200
Lafayette, LA 70501
(337) 262-6618

# CERTIFICATE OF COMPLIANCE

1.      This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because:

      (a)      This brief contains **10,730** words.

2.      This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

      (a)      This brief has been prepared in a proportionally spaced typeface using:

            Software Name and Version – **Microsoft Word Office 356**;

            in Typeface Name and Font Size - **Century Schoolbook 14 pt.**

*s/T. Forrest Phillips*                                  January 6, 2025
T. FORREST PHILLIPS                            Date
AL Bar # 3736E29R
Assistant United States Attorney